**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **In re:** | \* | |
| | \* | |
| **Earl N. McKinney, and** | \* | |
| **Gwendy L. McKinney,** | \* | |
| | \* | |
| **Debtors** | \* | **Chapter 13** |
| _____ | \* | **Case No. 05-21651** |
| | \* | |
| **JPMorgan Chase Bank** | \* | |
| **f/k/a The Chase Manhattan Bank,** | \* | |
| | \* | |
| **Movant** | \* | |
| | \* | |
| v. | \* | |
| | \* | |
| **Earl N. McKinney, and** | \* | |
| **Gwendy L. McKinney,** | \* | |
| | \* | |
| **Debtors/Respondents** | \* | |
| | \* | |
| **Peter C. Fessenden,** | \* | |
| **Chapter 13 Trustee,** | \* | |
| | \* | |
| **Respondent** | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Memorandum of Decision**

JPMorgan Chase Bank's motion for relief from stay is before me on a stipulated record. The only issue presented is whether cause for relief from stay exists because the debtors' residence, mortgaged to the bank, was "sold" at foreclosure before bankruptcy, rendering cure and reinstatement within Chapter 13 via § 1322(b) and (c)(1) impossible.[1]

---

[1] Unless otherwise indicated, all statutory sections cited are those of the Bankruptcy Reform Act of 1976, as amended ("Bankruptcy Code" or "Code") 11 U.S.C. § 101 et seq, up to, but not including, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub. L. 109-8).

**Facts**

Earl and Gwendy McKinney borrowed money from Domestic Loan and Investment Bank in 1995. The McKinneys' repayment obligation was secured by a mortgage on their Bowdoinham, Maine, residence. Through a series of assignments, JPMorgan succeeded Domestic as mortgagee.

The McKinneys defaulted. In October 2004 JPMorgan filed a state court foreclosure complaint. On March 22, 2005, the state court entered its foreclosure judgment and sale order, triggering the commencement of Maine's 90-day, pre-sale redemption period.[2] JPMorgan initially scheduled a foreclosure sale for July 25, 2005, but subsequently postponed the sale weekly until August 29, 2005, when it convened. On that day, JPMorgan was named the "successful high bidder." There is no evidence that the auction result was memorialized by written document.[3] On September 8, 2005, the McKinneys filed bankruptcy under Chapter 13. They have proposed a plan that would cure their mortgage arrears and reinstate the mortgage obligation. JPMorgan Chase executed and delivered (to itself) a quitclaim deed to the McKinney residence on November 16, 2005.[4]

---

[2] Maine's judicial foreclosure process, and pertinent statutory references, are discussed infra.

[3] JPMorgan Chase has not produced any document evidencing an enforceable sale obligation resulting from the auction. Attached as Exhibit C to the Debtor's Brief Objecting to JPMorgan Chase Bank's Motion for Relief from Stay [dckt. #42] is an unexecuted copy of the proposed purchase and sale agreement JPMorgan Chase proffered to auction attendees.

[4] Debtor's Brief, Exhibit D. With respect to its actions enforcing the mortgage, foreclosing, selling the property, executing the quitclaim deed, and receiving title, JPMorgan Chase acted in the following name and capacity: "JP Morgan Chase Bank f/k/a The Chase Manhattan Bank

**Discussion**

**1. Cure and Reinstatement Generally**

A Chapter 13 debtor has the opportunity to save his or her home from foreclosure by curing a mortgage default and, while continuing to pay the mortgage obligation as installments come due, curing pre-petition arrearages over time. The mechanism for doing so is set out in § 1322(b) & (c):

**11 U.S.C. § 1322. Contents of plan**

\* \* \*

(b) Subject to subsections (a) and (c) of this section, the plan may -

(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims;

(2) *modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;*

(3) *provide for the curing or waiving of any default;*

(4) provide for payments on any unsecured claim to be made concurrently with payments on any secured claim or any other unsecured claim;

(5) *notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;*

---

f/k/a Chemical Bank, as Trustee of IMC Home Equity Loan Trust 1995." The parties do not dispute that in all respects (significantly as foreclosing mortgagee/seller and as bidder/buyer) it was at all times the same entity.

3

(6) provide for the payment of all or any part of any claim allowed under section 1305 of this title;

(7) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

(8) provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor;

(9) provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity; and

(10) include any other appropriate provision not inconsistent with this title.

(c) *Notwithstanding subsection (b)(2) and applicable nonbankruptcy law -*

(1) *a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law;* and

(2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

11 U.S.C. § 1322(b), (c) (emphasis added).

Thus, the Chapter 13 debtor has the ability, state law notwithstanding, to retain a residence by de-accelerating a defaulted mortgage obligation and paying accrued arrearages over time. § 1322(b)(3), (5). Although § 1322(b)(2) eliminates a debtor's ability to reduce a secured residential mortgage obligation to the value of the lender's collateral (as can generally be done with other secured claims), a Chapter 13 debtor has the opportunity to snatch her residence from the jaws of foreclosure "until such residence is *sold* at a [lawful] foreclosure sale," § 1322(c)(1).

**2. The Issue**

JPMorgan Chase does not challenge the proposition that in Maine, where a mortgagor's state law rights in real estate expire at the conclusion of a pre-sale redemption period, see 14 M.R.S.A. §§ 6322-6323 (West 2003 & Supp. 2005), section 1322(c)(1)'s operation extends the mortgagor's property rights as a matter of federal law.  See M.C. Schinck v. Stephens (In re Stephens), 221 B.R. 290, 293-94 (Bankr. D. Me. 1998) (explaining § 1322(c)(1)'s interrelation with Maine foreclosure processes); cf. In re Cormier, 147 B.R. 285, 292-94 (Bankr. D. Me. 1992) (explaining state of the law before § 1322(c)(1)'s enactment).  The question for today is *how far into the foreclosure and sale process* (beyond the auction?) do those rights extend?  In other words, when is a residence "sold at a foreclosure sale" within the meaning of § 1322(c)(1)?

### 3. Approaching the Issue

What would seem a relatively straightforward inquiry is anything but.  Certainly, discerning the meaning of federal statutory terms is a question of federal law.  Securities and Exchange Comm. v. Variable Annuity Life Ins. Co. of America, 359 U.S. 65, 69 (1959); De La Cruz v. Cohen (In re Cohen), 191 B.R. 599, 609 (D.N.J. 1996).  But the courts that have attempted to say what "sold" means and when it occurs have taken disparate approaches, and reached different conclusions, based not only on their reading of § 1322(c)(1), but also on the widely divergent content of foreclosure processes among the states.

### 4. Understanding § 1322(c)(1)

In In re Beeman, 235 B.R. 519 (Bankr. D.N.H. 1999), Judge Deasy pithily explicated § 1322(c)(1)'s history and purpose:

> Section 1322(c)(1) was added to the Bankruptcy Code in 1994.  Before 1994, there was some confusion as to when Chapter 13 debtors lost their right to cure and reinstate a home mortgage.  Some courts had held that such a right was lost when a foreclosure auction was held.  See, e.g., Fed. Land Bank or Louisville v. Glenn (In

5

> re Glenn), 760 F.2d 1428 (6th Cir. 1985), cert. denied, 474 U.S. 849, 106 S.Ct.
> 144, 88 L.Ed. 2d 119 (1985); In re Clark, 738 F.2d 869 (7th Cir. 1984), cert.
> denied, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed. 2d 119 (1985).  However, in 1987,
> the Court of Appeals for the Third Circuit held that a Chapter 13 debtor's right to
> cure and reinstate a home mortgage was lost, pursuant to state law, upon entry of a
> foreclosure judgment, which occurred before the actual foreclosure auction.  See
> In re Roach, 824 F.2d 1370 (3d Cir. 1987).  It is generally understood that
> Congress enacted § 1322(c)(1) in an effort to resolve this confusion and create a
> uniform standard.  See In re Crawford, 232 B.R. 92, 95 (Bankr. N.D. Ohio 1999);
> In re Tomlin, 228 B.R. 916, 918 (Bankr. E.D. Ark. 1999).

Beeman, 235 B.R. at 524.  See also Colon v. Option One Mortgage Corp., 319 F.3d 912, 917-18

(7th Cir. 2003); In re Crichlow, 322 B.R. 229, 232-33 (Bankr. D. Mass. 2004).  The resolution

§ 1322(c)(1)'s enactment effected, however, has not been crystalline to the courts.  "Both the

statute and the legislative history, to the extent relied upon by courts that have found the statute

ambiguous, have created a great deal more discussion than the intended clarification."  Crichlow,

322 B.R. at 233.

   **5.  When is a Residence "Sold?"**

> There are generally two schools of thought with respect to § 1322(c)(1).  One
> approach is to find that the language of § 1322(c)(1) is unambiguous and conclude
> that a Chapter 13 debtor's rights to cure and reinstate are cut off as of the date of
> the foreclosure auction.  See, e.g., McCarn v. WyHy Fed. Credit Union, 218 B.R.
> 154, 161 (10th Cir. BAP 1998); [In re] Crawford, 232 B.R. [92], 96 [(Bankr. N.D.
> Ohio 1999)].  The contrary approach is to find that the statutory language is
> ambiguous and thus turn to legislative history in an effort to determine the
> legislature's intent.  Courts following the latter approach generally conclude that
> the statutory language is intended to cut off the debtor's right to cure and reinstate
> as of the point when a foreclosure sale is complete pursuant to state law.  See [In
> re] Tomlin, 228 B.R. [916,] 918 [(Bankr. E.D. Ark. 1999)] (listing various
> decisions finding that the language of § 1322(c)(1) is ambiguous).

Beeman, 235 B.R. at 524. True enough, the major fork in § 1322(c)(1) interpretation is the

ambiguous/unambiguous determination.  If a court determines the provision unambiguous, it must

then consider whether the content of state foreclosure law comes into play at all in achieving the

statutory aim.  Compare, e.g., In re Bobo, 246 B.R. 453, 457 (Bankr. D.C. 2000) (§ 1322(c)(1) is unambiguous; state foreclosure processes not to be considered in determining when property is "sold"), with Crichlow, 322 B.R. at 234 (§ 1322(c)(1) is unambiguous, but state foreclosure law is relevant to whether, and when, there has been a foreclosure sale).  Courts concluding that § 1322(c)(1) is ambiguous are doubly challenged.  They must first determine the provision's meaning in the face of contradictory legislative history, see McCarn v. WyHy Fed. Credit Union (In re McCarn), 218 B.R. 154, 160-61 & n.5 (B.A.P. 10th Cir. 1998), and then confront the extent to which state law must be taken into account, Colon, 319 F.3d at 917-19.

I agree with Judge Hillman that § 1322(c)(1)'s words are "sufficiently clear," Crichlow, 322 B.R. at 234, so that I need not repair to the "dimly lit passages of legislative history," Stephens, 221 B.R. at 294, to divine its meaning.  The phrase "sold *at* a foreclosure sale" refers to a sale that occurs *at* a foreclosure auction.  The additional phrase "*conducted* in accordance with applicable nonbankruptcy law" requires that state law be consulted to assure the sale was noticed, convened, and held (i.e., "*conducted*") in compliance with state law. See also, e.g., Cain v. Wells Fargo Bank, N.A. (In re Cain), 423 F.3d 617, 620 (6th Cir. 2005); McCarn, 218 B.R. at 160;  In re Watts, 273 B.R. 471, 476 (Bankr. D.S.C. 2000); Homeside Lending, Inc. v. Denny (In re Denny), 242 B.R. 593, 596 (Bankr. D. Md. 1999); In re Crawford, 232 B.R. 92, 96 (Bankr. N.D. Ohio 1999).[5]

With that said, and acknowledging that some courts hold a reasoned, but contrary view, I note that the content of Maine law confirms the sense of my conclusion.  Maine is not among

---

[5] As explained in Stephens, 221 B.R. at 294 n.10, "state law" is but a subset of "applicable nonbankruptcy law," but it is the only pertinent subset to the usual § 1322(c)(1) inquiries.

7

those states in which § 1322(c)'s straightforward operation truncates a mortgagor's state law rights, such as a post-sale redemption, that persist beyond the foreclosure auction. Understandably, in those jurisdictions it was somewhat confounding to realize that Congress, in "fixing" what it viewed to be an overly restrictive approach to Chapter 13 cure rights, i.e., the Third Circuit's decision in Roach to the effect that cure rights did not survive a foreclosure judgment, effected a remedy that operated to reduce the duration of cure rights by cutting them off at the foreclosure sale.

As I have already observed, both here and in Stephens, § 1322(c)(1) provides Maine debtors with substantive rights that do not exist in state law, rights that endure beyond expiration of the pre-sale redemption period, when the mortgagor's rights in the real estate would otherwise have been cut off. Under Maine law, insofar as rights in the real estate are concerned, the mortgagor is entirely out of the picture well before the foreclosure sale convenes. Moreover, 14 M.R.S.A. § 6323(1) requires that judicially foreclosed real estate be sold at public sale and includes the express statement that, "The date of the public sale is the date on which bids are received to establish the sales price, *no matter when* the sale is completed by the delivery of the deed to the highest bidder." (Emphasis added.)[6]

---

[6]    The pertinent section reads in full:

**§ 6323. Sale following expiration of period of redemption**

**1. Procedures for all civil actions.** Upon expiration of the period of redemption, if the mortgagor or the mortgagor's successors, heirs or assigns have not redeemed the mortgage, any remaining rights of the mortgagor to possession terminate, and the mortgagee shall cause notice of a public sale of the premises stating the time, place and terms of the sale to be published once in each of 3 successive weeks in a newspaper of general circulation in the county in which the premises are located, the first publication to be made not more than 90 days after the expiration of the period

Thus, I conclude that the McKinneys' residence was "sold at a foreclosure sale" before they filed their bankruptcy petition.[7]

---

> of redemption. The public sale must be held not less than 30 days nor more than 45 days after the first date of that publication and may be adjourned, for any time not exceeding 7 days and from time to time until a sale is made, by announcement to those present at each adjournment. The mortgagee, in its sole discretion, may allow the mortgagor to redeem or reinstate the loan after the expiration of the period of redemption but before the public sale. The mortgagee may convey the property to the mortgagor or execute a waiver of foreclosure, and all other rights of all other parties remain as if no foreclosure had been commenced. The mortgagee shall sell the premises to the highest bidder at the public sale and deliver a deed of the sale and the writ of possession, if a writ of possession was obtained during the foreclosure process, to the purchaser. The deed conveys the premises free and clear of all interests of the parties in interest joined in the action. The mortgagee or any other party in interest may bid at the public sale. If the mortgagee is the highest bidder at the public sale, there is no obligation to account for any surplus upon a subsequent sale by the mortgagee. Any rights of the mortgagee to a deficiency claim against the mortgagors are limited to the amount established as of the date of the public sale. The date of the public sale is the date on which bids are received to establish the sales price, no matter when the sale is completed by the delivery of the deed to the highest bidder.
>
> **2. Additional notice requirements for civil actions commenced on or after January 1, 1995.** In foreclosures by civil action commenced on or after January 1, 1995, the mortgagee shall cause notice of the public sale to be mailed by ordinary mail to all parties who appeared in the foreclosure action or to their attorneys of record. The notice must be mailed no less than 30 calendar days before the date of the sale. Failure to provide notice of the public sale to any party who appeared does not affect the validity of the sale.

[7]  Even if I were to conclude that § 1322(c)(1) is ambiguous and that I must look to state law to ascertain when a foreclosure sale "occurs" or "is final," e.g., In re Mellino, 333 B.R. 578 (Bankr. D. Mass. 2005); Beeman, supra; In re Faulkner, 240 B.R. 67 (Bankr. W.D. Okla. 1999), under Maine law it is plain that the foreclosure process is complete (and then some) *as to the debtor/mortgagor* by the time the auctioneer's hammer falls. Indeed, as far as the debtor is concerned, the matter settled by the auction is not whether he or she has lost the real estate, it is whether there will be surplus funds or a deficiency judgment. 14 M.R.S.A. § 6323; Cormier, supra. The filing of a post-auction report of sale is not a condition to effective title transfer via foreclosure sale. 14 M.R.S.A. § 6324; compare Faulkner, 240 B.R. at 68 (state law requirement that sale be confirmed by court means that sale has not been "conducted" in accordance with state law until confirmation is had), and In re Barham, 193 B.R. 229, 231 (Bankr. E.D.N.C. 1996) (sale not

### 6. A Sale "Conducted in Accordance with Applicable Nonbankruptcy Law"

The McKinneys suggest that there were fatal defects in the foreclosure sale that leave the possibility of cure open to them. They contend that JPMorgan Chase conducted the sale after the statutorily mandated time window for sale and that it did not enter into a binding contract with the high bidder. These points need not detain us long.

To begin, although 14 M.R.S.A. § 6323(1) requires that the public sale be conducted no sooner than thirty days and no more than forty-five days after the first date the notice of sale is published, the fact that the sale here was conducted more than forty-five days after the first publication is of no moment. The statute expressly permits the sale to be continued for up to seven days, and "from time to time until a sale is made." JPMorgan Chase's weekly sale postponements from the original sale date until the date of ultimate sale did not run afoul of the statute.[8]

Finally, given that JPMorgan Chase both auctioned off the McKinneys' residence and purchased it at auction as itself, I cannot agree with the McKinneys that whether or not it executed a written purchase and sale contract to itself following the auction is of any significance. As I have already stated, the public sale having been conducted and the high bidder selected, the property was "sold at a foreclosure sale" within the meaning of § 1322(c)(1) before the

---

complete until expiration of ten-day post-auction upset bid opportunity), with Colon, 319 F.3d at 915 (state's post-sale confirmation process is insignificant in view of federal concerns).

[8] Moreover, problems with sale timing generally affect the mortgagee's right to a deficiency, rather than sale's validity. Cadle Co. v. LCM Assocs., 749 A.2d 150 (Me. 2000) (sale conducted too soon after first publication of sale notice; mortgagee denied deficiency claim).

McKinneys filed their Chapter 13 petition.[9]

## Conclusion

For the reasons set forth above, JPMorgan Chase's motion for relief from stay will be granted. A separate order will enter forthwith.

June 14, 2006                                    /s/ James B. Haines, Jr.
_____      _____
Date                                             James B. Haines, Jr.
                                                 U.S. Bankruptcy Judge

---

[9] The parties' stipulation suggests that the McKinneys would argue that problems with notice (to them) taint the sale. They have not developed the argument and I will not address it, other than to note that 14 M.R.S.A. §6323(2) strongly suggests that their point would not go to the sale's validity.